145 F.3d 1338
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Wanda HARRIS; Reginald Denny; Fidel Lopez; Takeo Hirata,
Plaintiffs-Appellants,
v.
Daryl GATES; Matthew Hunt; Ronald Frankel; Ronald Wayne
Banks; Paul D. Jefferson; Bob Hensohn; City of Los
Angeles, Defendants-Appellees.
 No. 96-56702.
D.C. No. CV-93-02453-WMB.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 2, 1998.
Decided May 26, 1998.
 
 1
 Appeal from the United States District Court for the Central District of California William Matthew Byrne, Jr., District Judge, Presiding.
 
 
 2
 Before WIGGINS and KLEINFELD, Circuit Judges, SMITH**, District Judge.
 
 
 3
 MEMORANDUM*
 
 
 4
 Plaintiffs argue that genuine issues of material fact exist on the issue of whether defendants, deployment decisions were motivated by discriminatory intent. We have studied the record with care, but we are unable, on the record before us, to identify a genuine issue of fact.
 
 
 5
 At 3:00 p.m. on April 29, 1992, it was announced that the officers who beat Rodney King had been acquitted. Around 4:00, crowds began to gather and become violent at the intersection of Florence and Normandie in Los Angeles. The intersection of Florence and Normandie lies within the LAPD's "77th Street Division." The Watch Commander of the 77th Street Division, Lt. Moulin, believed that his officers were badly outnumbered and withdrew to a "Field Command Post" at a bus yard on 54th and Van Ness. Lt. Moulin ordered all 911 calls to be rerouted to the bus yard, and called for help.
 
 
 6
 Over the next few hours, Lt. Moulin was joined at the bus yard by several hundred police officers, and by three levels of Department command: Capt. Jefferson, Commander Banks, and Deputy Chief Hunt. However, the bus yard had no computer and few telephones. According to a report by the Special Adviser to the Board of Police Commissioners (the "Webster report"), submitted in the summary judgment papers, this "command post" was ineffectual:
 
 
 7
 [T]he command post proved to be incapable of capturing, assessing or effectively using the information it received. Deprived by these failures of meaningful intelligence and assessment of the rapidly developing situation, the 77th was made blind.
 
 
 8
 As a result, the 77th Street Division, at the center of the L.A. riots, completely lost police service during the first hours of violence.
 
 
 9
 At approximately 6:45 p.m. on April 29, 1992, plaintiff-appellants Reginald Denny, Takeo Hirata, and Fidel Lopez were attacked and seriously injured at the intersection of Florence and Normandie. In this case, the plaintiffs sue several LAPD command officers, including Jefferson, Banks, Hunt, and Chief of Police Daryl Gates under 42 U.S.C. §§ 1983 and 1985 for violating their Fourteenth Amendment Equal Protection rights. Plaintiffs' theory of the case is that the defendants did not provide police protection at the intersection of Florence and Normandie because it was in a minority neighborhood. Plaintiffs do not sue Lieutenant Moulin, who actually made the decision to withdraw the police to the bus yard, just his superiors.
 
 
 10
 Government action which intentionally discriminates based on a suspect classification violates the Fourteenth Amendment unless it is narrowly tailored to further a compelling state interest. See Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 264-65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). As a predicate for application of strict scrutiny, plaintiffs had to submit evidence from which a jury could conclude that the police deployment decisions intentionally discriminated against people in the 77th Street Division because of the racial composition of the neighborhood.
 
 
 11
 The evidence submitted to the district court would not have enabled a jury to conclude that the lack of police protection at the corner of Florence and Normandie resulted from intentional discrimination by race or ethnicity. Plaintiffs submitted
 
 
 12
 evidence that fewer arrests were made in South Bureau, which included the 77th Street Division, than in Valley Bureau, which was "predominantly Anglo," during the several days of the "Rodney King Riots," even though South Bureau had more crime. They also submitted evidence that, as mentioned above, the 77th Street Division was stripped bare of police protection during the first several hours of the riots. But this evidence does not establish racially discriminatory intent and causation, for several reasons. Among them is that on the day that all the plaintiffs were attacked, South Bureau had more arrests than Valley Bureau (albeit in parts of South bureau other than the 77th Street Division).
 
 
 13
 Also, the record showed various reasons other than racially discriminatory purpose why fewer arrests were made during the entire course of the riots, and why no law enforcement was accomplished in the 77th Street Division during the first few hours of the riots. One reason was that the police were unsure whether more aggressive enforcement would reduce or exacerbate the violence in the 77th Street Division. Another was doubt about whether they had enough force at their command to act effectively in the 77th Street Division. Another inference a jury might draw was that poor preparation and management incapacitated the police from making decisions and acting on them. Another is that the police were overwhelmed in South Bureau, especially the 77th Street Division, but were more able to cope in Valley Bureau, because the load was lighter.
 
 
 14
 The Webster report, cited extensively by the parties, blamed "poor preparation" and "massive leadership failure at the Command Staff levels" for failure to act. The Webster report said that it found no evidence to support the view that "the paralysis was deliberately induced ... to teach the city a lesson or for some other nefarious purpose."
 
 
 15
 Plaintiffs argue that evidence of racially discriminatory attitudes within the Los Angeles Police Department and by its chief, Daryl Gates, support an inference of discriminatory intent in deployment of forces during the Rodney King riots. We have carefully studied the evidence, and conclude that the connection is not established. For example, plaintiffs argue that evidence of inappropriate police use of chokeholds, and comments by police chief Daryl F. Gates, made about a decade and a half before the riots, establish racial animus. But that evidence lacked probative value because of its age. Also, it tends to support accusations of excessive police aggression, not inadequate police aggression, to the extent such old evidence supports any inference. Likewise the evidence plaintiffs cite that police used dogs against blacks more than whites, or that more police shootings involved blacks, tend to support an inference of too much aggression, not inadequate aggression.
 
 
 16
 Plaintiffs submitted a declaration by a former police officer, now a professor at Temple University, James Fyfe, which says "it is my opinion that race was one of the motivating factors with respect to the failure to properly deploy police Officers at the intersection of Florence and Normandie." If that opinion is cognizable evidence, then it would establish a genuine issue of material fact; however, Federal Rule of Civil Procedure 56(e) requires that declarations be "made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that affiant is competent to testify to the matters stated therein." The Fyfe declaration did not meet that standard for purposes of this opinion. It does not set forth facts as would make the opinion admissible in evidence and does not show affirmatively that professor Fyfe is competent to testify that "race was one of the motivating factors" in the deployment. He was not there, and he does not establish that any facts provide a foundation for his opinion.
 
 
 17
 "[I]n the context of a summary judgment, an expert must back up his opinion with specific facts." United States v. Various Slot Machines, 658 F.2d 697, 700 (9th Cir.1981). The object of Rule 56(e) "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit" Lujan v. National Wildlife Federation, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). An expert's "conclusory allegations" do not defeat summary judgment where the record clearly rebuts the inference the expert suggests. In re Worlds of Wonder Securities Litigation, 35 F.3d 1407, 1425-27 (9th Cir.1994).
 
 
 18
 We do not draw a conclusion of our own as to whether the Webster report was correct in attributing the lack of law enforcement in the 77th Street Division to poor preparation and massive leadership failure. All we decide is whether the record contained evidence from which a jury could conclude that racially discriminatory motivations caused the deployment of police to be inadequate at the relevant times in 77th Street Division. We have looked for and not found such evidence, so we conclude that the district judge did not err in granting summary judgment.
 
 
 19
 AFFIRMED.
 
 
 
 **
 The Honorable Fern M. Smith, United States District Judge for the Northern District of California, visiting judge
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3